**AFFIDAVIT**

I, Evan R. Kalaher, do under oath depose and state:

**INTRODUCTION**

1.          I am a Special Agent of the Federal Bureau of Investigation ("FBI"), United

States Department of Justice and have been employed in that capacity since January 2018.  I am

currently assigned to the Providence, Rhode Island Resident Agency, which is part of the Boston

Field Division.  Prior to my current assignment, I was assigned to Boston Divisions Organized

Crime Drug Enforcement Task Force ("OCDETF") where I concentrated on investigating

complex domestic and international drug trafficking and money laundering investigations related

to criminal enterprises.  Prior to my position as a Special Agent, I held an investigative position

within the FBI as an Investigative Specialist with primary duties of conducting discreet

surveillance.  During that time, I was assigned to the Boston Division Special Surveillance

Group that specialized in mobile surveillance in support of counterintelligence and counter-

terrorism operations.  Since my 21 weeks of basic investigative training at the FBI Academy in

Quantico, Virginia, I have received additional training on conducting criminal investigations and

have participated in a number of such investigations.  I am a law enforcement officer of the

United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an

officer of the United States who is empowered by law to conduct investigations of and to make

arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.          I have received training in the field of narcotics and firearms enforcement and

investigations.  I am familiar with the habits, methods, routines, practices and procedures

commonly employed by persons engaged in the trafficking of illegal firearms and drugs.  I have

been the affiant on numerous affidavits in support of search warrants, arrest warrants, and other

applications.  Through my training, education and experience, I have become familiar with the

manner in which illegal narcotics and firearms are transported, stored, and distributed, and with

the methods of payment for such items.

3.      This investigation was initiated by the FBI Rhode Island Safe Streets Task Force

(hereinafter "the Task Force"). This affidavit is based on my own investigation and on

information provided to me by other law enforcement officers/agents and other federal agencies.

I have also relied on reports of investigations that I have prepared or that were prepared by other

law enforcement officers/agents, business records, and public and/or law enforcement databases.

I have further relied on information provided to me, and to other law enforcement agents, by a

cooperating witness, who is discussed herein.

4.      This affidavit is made in support of the issuance for a criminal complaint for the

following two individuals: (1) NIPUKTUK JOSEPH and (2) AIDAN DONNELLY

(cumulatively referred to as the "Defendants").  As set forth herein, there is probable cause to

believe that the two defendants have engaged in the trafficking of controlled substances in

violation of federal law, including, 21 U.S.C. §§ 846 (conspiracy to distribute controlled

substances) and 841(a)(1) (distribution of controlled substances).  In this regard, I am aware that

JOSEPH is presently charged in this District with conspiracy to distribute and possess with intent

to distribute 40 grams or more of fentanyl and multiple counts distribution of, and possession

with intent to distribute, fentanyl.  I am further aware that JOSEPH is on release and is being

supervised by United States Probation Services in the District of Massachusetts (hereinafter

"U.S. Probation").  Investigators have been in contact with U.S. Probation regarding JOSEPH

and have confirmed that JOSEPH is residing at 78 Campbell Street, New Bedford,

Massachusetts.

**PROBABLE CAUSE**

5.       The investigation of the Defendants involves the use of a cooperating witness

(hereinafter referred to as "CW-1").  CW-1 is presently a defendant in a federal case involving

drug trafficking and is cooperating in an attempt to mitigate his/her potential sentence.  CW-1

has a criminal history that includes multiple felony convictions for drug distribution, assault,

theft and robbery.  Since the start of his/her cooperation in late 2021, CW-1 has provided me

with information that I or other law enforcement agents have independently corroborated through

toll records, recorded conversations, video recordings, physical surveillance, and other law

enforcement confidential sources.  To the present date, CW-1 has proven to be a credible and

reliable informant.

6.       The probable cause against the Defendants includes three controlled drug

purchases involving CW-1.  These controlled drug purchases involve common practices.  In the

three controlled purchases, CW-1 arranged the drug deal by contacting either JOSEPH or

DONNELLY on different cellular telephones that the two used over time.  On each occasion, the

contact was by text messages, phone calls, or FaceTime, and a quantity of narcotics was ordered.

The calls made by CW-1 on the day of the controlled purchases were recorded and made in the

presence of law enforcement.  However, the set-up communications made by CW-1 at my

direction, while not in the presence of law enforcement, were not recorded.  On each occasion,

CW-1 immediately informed me of the communications that CW-1 had with Defendants and any

text messages were preserved.  On each occasion, law enforcement investigators checked the

CW-1 for contraband and currency prior to the transaction to be sure that CW-1 was not already

in possession of any narcotics and did not have any additional cash on his/her person.  CW-1 was

usually supplied with only enough Official Agency Funds ("OAF") for the purchase of the

quantity of narcotics that had been ordered.  On one occasion, law enforcement allowed CW-1 to have an additional $20 in order to pay for drinks as the deal took place at a restaurant.

7.      In addition, CW-1 was equipped with an audio and video recording device for all of the controlled purchases.  CW-1 was followed to the transaction sites and surveillance was maintained near those locations.  Following the transactions, CW-1 was followed to a predetermined location where he/she turned over the narcotic evidence to me or another law enforcement officer working on this investigation.  In each case, CW-1 was debriefed, and the audio and video recording devices were retrieved and reviewed.  Additionally, a field test was performed on all of the drugs that had been purchased.  In every instance, the field tests returned a positive indication for the presumptive presence of fentanyl.  Whenever I use the terms "controlled purchase" or "controlled buy" in this affidavit, the above procedures were followed. After each controlled buy, the drugs were secured as evidence and submitted to either the DEA Northeast Laboratory or the RI State Department of Health Laboratory.  Recently, investigators received the toxicology report from the Rhode Island Laboratory for the substance obtained on November 4, 2021.  The net weight of the substance was 28.03 grams and the substance tested positive for: Fentanyl, Heroin, Para-Fluorofentanyl, Tramadol and Xylazine.  The other toxicology reports are still pending regarding the controlled substances seized in this investigation.

8.      In mid-October, 2021, CW-1 provided investigators with information about an individual who was trafficking controlled substances in Rhode Island and Massachusetts.  CW-1 provided the description as a thin white male, approximately 6' tall, blue eyes, in his early 20's with tattoos on his hands who resided in New Bedford, MA.  This individual was known to CW-1 by his SnapChat moniker which was "BigBands."  CW-1 noted that the male was allegedly a

Blood gang member and able to sell firearms along with narcotics.  Investigators began an

investigation into the unknown male a/k/a "BigBands."

9.      CW-1 engaged in a consensually-monitored FaceTime conversation with that

individual (who was subsequently identified as DONNELLY[1]) on the evening of November 2,

2021.  During the conversation, they discussed drug trafficking.  Additionally, DONNELLY

showed CW-1 firearms.  During this conversation, at my direction, CW-1 ordered 30 grams of

fentanyl to be purchased on November 4, 2021.  DONNELLY told CW-1 that he had to go get it

from his "plug."  Based on my training and experience, I am aware that "plug" is a common

slang term referring to a narcotics supplier.  DONNELLY told CW-1 that his "plug" lives with

DONNELLY in the same residence, and that his narcotics supplier was, in turn, supplied by an

uncle in Boston.  At my direction, CW-1 scheduled the controlled purchase at 12:00 p.m. on

November 4, 2021.  However, in a subsequent conversation with DONNELLY on November 3,

DONNELLY explained that his supplier, with whom he lives, was on Federal Probation and that

his supplier's Probation Officer was coming over the house for a routine check at 1 p.m. on

November 4.  As such, DONNELLY was instructed by his supplier to schedule the drug sale

earlier so it would not conflict with the visit by the supplier's Probation Officer.

10.     On Thursday, November 4, 2021, DONNELLY contacted CW-1 via text message

to confirm the drug transaction for later that day.  At first, DONNELLY provided the address of

"70 Willis st new Bedford ma" via text message.  Based on this information, law enforcement

initiated surveillance of that address prior to the controlled purchase.

---

[1] As set forth herein, DONNELLY was identified through a traffic stop following a controlled
buy involving CW-1.

11.     CW-1 then met with members of the Task Force to participate in the controlled narcotics purchase.  At the direction of agents, CW-1 placed a consensually-recorded telephone call to DONNELLY at the number 774-438-2155.  During the call, CW-1 informed DONNELLY that he/she was 15 minutes away. DONNELLY began explaining to CW-1 about Willis Street when another male could be heard in the background saying "no, just have him come here, just have him come here."  At that point, DONNELLY told CW-1 that he would send CW-1 a new address and told CW-1 to "come inside my crib."  Prior to ending the call, DONNELLY told CW-1 "just let me know when you're here and I'll come outside and let you inside."  The call ended and shortly thereafter CW-1 received a text message from DONNELLY on the 2155 number with the address of "78 Campbell st New Bedford."

12.     Agents initiated surveillance in the vicinity of 78 Campbell Street, New Bedford, Massachusetts.  Based on my training and experience, it is common for drug traffickers to provide a different address that is not the residence used by the trafficker in order to protect the location of the trafficker's narcotics and/or drug proceeds.  70 Willis Street is within 0.1 miles of 78 Campbell Street.

13.     Based on our investigation, we have identified that 78 Campbell Street in New Bedford is a residence used by JOSEPH.  As noted above, JOSEPH is presently on pre-sentencing release based on a pending case in this District and is under the supervision of U.S. Probation.  Investigators confirmed with U.S. Probation that not only was JOSEPH using 78 Campbell as his residence, but that there was a visit scheduled for that residence on November 4 – consistent with the statements made by DONNELLY about his source of supply for fentanyl. In addition, the charges to which JOSEPH pled guilty involved the distribution of fentanyl.

14.     Pursuant to the procedures outlined above, CW-1 was searched, and was provided with an audio/video recording device and $2,500 in OAF.  Thereafter, CW-1 was directed to meet with DONNELLY and purchase 30 grams of fentanyl.  Agents surveilled CW-1 to 78 Campbell Street, where he/she arrived at approximately 11:13 a.m.  Upon arriving at that location, Agents observed CW-1 as he/she walked to the front of the residence and met with a white male wearing a black sweater and blue jeans on the porch.  They both entered the residence.  At approximately 11:27 a.m., agents observed CW-1 exit the front door of 78 Campbell Street carrying a box of Ramen noodles, return to his/her vehicle, and depart the area.  Agents followed CW-1 to the pre-determined meeting location.  At that location, Agents searched the vehicle and CW-1 with negative results.  Agents recovered the recording device and a box of Ramen noodles containing a clear plastic bag with a hard, brown, powdery substance consistent in color and texture with that of fentanyl.  As noted above, the substance was submitted to a laboratory and tested positive for the presence of controlled substances, including fentanyl.  The net weight of the substance is 28.03 grams.

15.     CW-1 was then debriefed.  CW-1 stated that upon his/her arrival to the location he/she spoke to DONNELLY on the 2155 number and DONNELLY instructed CW-1 to park on the street out in front of the residence.  CW-1 saw DONNELLY on the front porch of the residence as he/she arrived in the vehicle.  Upon entry into the first-floor, CW-1 was greeted by a male who he/she described as a unknown Hispanic male, approximately 23 years old, with should length hair in a ponytail.  The male removed the bag of fentanyl from his pocket and provided it to CW-1.  CW-1 provided the money directly to the male.  All three then engaged in a conversation regarding how to "cut" the fentanyl in order to make a better product to sell to the "junkies" to make sure they do not die from the fentanyl.  The male (who was subsequently

identified by CW-1 as JOSEPH through a photo line-up) also told CW-1 about his ongoing

federal case. The description that CW-1 provided to me of the unknown male matches the

physical description of NIPUKTUK JOSEPH.

16.     I reviewed the audio/video recording of CW-1's meeting with DONNELLY and

JOSEPH. Although, a clear still image was unable to be captured of the participants, I

corroborated other information that CW-1 provided in the debrief interview.  The individual later

identified as JOSEPH spoke to CW-1 regarding his pending federal charges in the recording.

One useful still image was captured when CW-1 first walked up onto the front porch of the

residence and met with someone wearing a black hooded sweatshirt.  The video captured the

male wearing a Nike swoosh chain around his neck with the words "ADIO" beneath it.  I believe

this to be DONNELLY as both he and JOSEPH referred to DONNELLY as "ADIO" in

subsequent conversations.

17.     After I received the information from CW-1, and after listening to audio/video

recording where they spoke about the pending federal charges, law enforcement contacted U.S.

Probation.  U.S. Probation confirmed that JOSEPH resided at that address and confirmed that

there was a routine check in with JOSEPH on November 4 at 1:00 p.m.

18.     On or about November 16, 2021, I met with CW-1 to provide him/her with a

photo line-up containing a Massachusetts drivers license photograph of JOSEPH along with

other similar images.  CW-1 identified JOSEPH from the line-up as the individual who provided

the fentanyl to CW-1 while with DONNELLY on November 4 at 78 Campbell Street.

19.     At my direction, on November 10, 2021, CW-1 contacted DONNELLY using the

number 774-438-2155 to arrange to purchase 50 grams of fentanyl.  By text message,

DONNELLY quoted CW-1 with a price of "76 a gram at 50 grams" for a total of $3,800 for the

50 grams.  Later in the text conversation, DONNELLY told CW-1 that "New bricks in" and "So

shit is fresh."  Kilograms are routinely referred to as "bricks" in drug trafficking organizations.

On November 12, 2021, CW-1 contacted DONNELLY again and ordered the 50 grams of

fentanyl to be delivered to CW-1 in Rhode Island.  DONNELLY told CW-1 that he would talk to

CW-1 the next day.

20.     On November 14, 2021, CW-1 and DONNELLY engaged in a text message

conversation and confirmed the price and quantity again of the 50 grams.  Later that day, CW-1

was contacted by JOSEPH who was using the number 774-269-8455 by text messaging.

Investigators subsequently identified that the phone was subscribed under the name of a female.

Based on communications with U.S. Probation, we have identified that the female listed as the

subscriber of the phone was JOSEPH's girlfriend and that she lived with JOSEPH at the 78

Campbell Street address at the time of the events set forth herein.  In addition, the residential

address for the phone is one which was previously used by JOSEPH for his Massachusetts

Drivers License.  The following were text messages sent by JOSEPH ("nip"):

> JOSEPH:  Yoo
> JOSEPH:  Its nip the n***a u met threw adio [DONNELLY]
> JOSEPH:  FaceTime when ever you straight

On November 15, 2021, CW-1 and JOSEPH engaged in a non-recorded FaceTime conversation.

CW-1 provided the following information to investigators in a debrief interview.  JOSEPH told

CW-1 that he and DONNELLY were unable to travel into the state of Rhode Island due to

JOSEPH's pending federal case.  JOSEPH stated that DONNELLY would provide the fentanyl

to CW-1 only in Massachusetts.  The two then agreed to meet at a TGI Fridays restaurant located

in Seekonk, Massachusetts, to do the drug deal.

21.     The next day, JOSEPH contacted CW-1 through SnapChat – this contact was not recorded.  Per CW-1, JOSEPH told CW-1 that JOSEPH was unable to complete the drug transaction due to an ultrasound for his girlfriend who was pregnant with their child and JOSEPH also had to go to the DMV.  As such, they delayed the controlled purchase one day until November 16.  Investigators have confirmed JOSEPH's girlfriend was pregnant during this period.

22.     On November 16, 2021, CW-1 met with members of the Task Force to participate in a controlled narcotics purchase from DONNELLY.  In anticipation of the controlled purchase, Agents established surveillance at the TGI Fridays located at 1105 Fall River Avenue in Seekonk.  Agents also established static surveillance inside the TGI Fridays restaurant.  At approximately 5:19 p.m., CW-1 received a FaceTime call from DONNELLY, who was using 774-438-2155.  This call went unrecorded.  CW-1 immediately contacted me and provided the following information regarding the call.  During the call, DONNELLY said he just finished meeting with the "plug" up in Boston and identified him as "Nips uncle."  CW-1 stated that DONNELLY showed him/her the drugs which were wrapped in a green cellophane wrapping.  DONNELLY ended the call and stated he would inform CW-1 upon his arrival at the TGI Fridays.

23.     Shortly thereafter, CW-1 received an incoming FaceTime call from JOSEPH, who was using 774-269-8455.  CW-1 immediately informed me of the contact and provided the following information.  JOSEPH specifically explained his federal drug charges to CW-1.  In that case, JOSEPH stated that he was serving up customers with "runners" to a "black dude."  JOSEPH learned after he was arrested that the "black dude" was an undercover ATF Agent.  JOSEPH also said that a co-defendant received an 11-month sentence in federal prison and

explained to CW-1 that JOSEPH had 5 years hanging over his head for the charges.  Prior to

ending the call, JOSEPH told CW-1 that JOSEPH gave DONNELLY 50 grams of "cut" to add to

the fentanyl to give to CW-1.

24.     At approximately 6:02 p.m., CW-1 made an outgoing, consensually-recorded

FaceTime call to DONNELLY using 774-438-2155.  I monitored this call.  During the call,

DONNELLY showed CW-1 what appeared to be the narcotics wrapped in green cellophane.

They exchanged conversation regarding the travel to Boston and how long it took.  DONNELLY

told CW-1 that the "plug" gave him 50 grams of cut to add to the fentanyl.  CW-1 asked

DONNELLY if "drinks were on him" when he got to TGI Fridays.  DONNELLY explained that

he was only 20 years old and could not purchase an alcoholic drink because of his age.

DONNELLY stated that he had to use the restroom when he arrived to TGI Fridays.

25.     Pursuant to the procedures outlined above, CW-1 was searched, and was

provided with an audio/video recording device and $3,800 in OAF.[2]  Thereafter, CW-1 was

directed to meet with DONNELLY and purchase 50 grams of fentanyl.  CW-1 was continuously

surveilled to the TGI Fridays where he/she arrived at approximately 6:26 p.m.  At approximately

6:44 p.m., Agents observed a white Honda Accord bearing Massachusetts license plate

2WWC34 enter the parking lot of TGI Fridays.  A white male wearing a green hooded sweatshirt

and black pants (subsequently identified as DONNELLY) exited the front passenger side door of

the vehicle and entered the restaurant.  Inside the restaurant, agents observed DONNELLY walk

directly to the restroom within TGI Fridays.  The white Honda Accord was surveilled to the

---

[2] Due to the fact that the meeting was pre-arranged at a restaurant and DONNELLY and CW-1
planned to have a drink at TGI Fridays, agents authorized CW-1 to keep an extra $20 in order to
pay for a drink while at TGI Fridays.

Chik-Fil-A parking lot, directly across the street from the TGI Fridays, where it parked and no one exited.

26.     At approximately 6:54 p.m., agents observed CW-1 exit the restaurant, enter his/her vehicle and depart the area.  Surveillance was maintained on CW-1 to a pre-determined meeting location.  Upon meeting with CW-1 he/she provided agents with the recorder and a two green plastic baggies.  One of which contained a hard, white powdery substance consistent in color and texture of fentanyl and weighed approximately 53.4 grams – as noted above, this substance tested positive for the presence of fentanyl pursuant to a field test.  The second baggie which appeared to be smaller contained a light brown powdery substance and is believed to the "cut" weighed approximately 21.3 grams.

27.     CW-1 was debriefed and provided the following information regarding the controlled purchase at TGI Fridays.  CW-1 received a text message from DONNELLY that said he was 15 minutes away from TGI Fridays.  When DONNELLY arrived, he sat down in the booth and was wearing a green hooded sweatshirt.  They greeted each other and DONNELLY spoke about the ride down from Boston where he met the "plug."  DONNELLY said he had a girl drive him and she was "sniffing" the whole way down and even had to stop to throw up on the highway.  DONNELLY provided CW-1 with the narcotics under the table while seated.  DONNELLY did not count the money that CW-1 provided him.

28.     Agents kept DONNELLY under surveillance and observed him leave the area in the white Honda in which he arrived.  I coordinated with Massachusetts State Police to conduct an identification-only traffic stop of the white Honda in order to identify the driver and front seat passenger who had met with CW-1 to provide the 50 grams of fentanyl.  DONNELLY was identified as the individual who had conducted the drug transaction with CW-1.

29.     On February 24, 2022, CW-1 met with members of the Task Force to participate

in a controlled narcotics purchase from DONNELLY in New Bedford, Massachusetts.  In

anticipation of the controlled purchase, agents established surveillance at 78 Campbell Street in

New Bedford.  The day prior, at my direction, CW-1 contacted DONNELLY, using number 774-

438-2288, to schedule the purchase of 20 grams of fentanyl from DONNELLY.  On February 23,

2022, CW-1 and DONNELLY engaged in the following text message conversation:

> DONNELLY: Yo
> DONNELLY: You want that 20?
> DONNELLY: You gotta lmk like now xuz
> CW-1: Yeah cuz I can come grat it tomorrow the 20
> CW-1: I already grabbed 20 earlier that's y I cant get da full 40 right now bro
> CW-1: Lmk
> CW-1: Wat time should I go out ther cuz
> DONNELLY: Aight I better see u Tmo bro
> DONNELLY: Grabbing this now
> DONNELLY: I'll see u Tmo rigjt
> CW-1: I told u I got u broski
> CW-1: Jus lmk wit time to head out ther

Based on that conversation, I believe that DONNELLY was referring to 20 grams when he told

CW-1 via text "You want that 20?"  Later that evening, at approximately 10:09 p.m., CW-1

received an incoming text message from DONNELLY that stated: "Grabbed it."  I believe that

DONNELLY was referring to the 20 grams of fentanyl that DONNELLY agreed to sell to CW-1

on the following day.

30.     On the day of the controlled purchase, DONNELLY and CW-1 re-engaged in a

text message conversation confirming the specific details of the controlled purchase.

Specifically, they shared the following exchange of text messages:

> CW-1: I'm on da way broski
> DONNELLY: Okay
> DONNELLY: It's wrapped up
> DONNELLY: Ready for u to crab it brodie
> DONNELLY: Lmk

CW-1: Aiht I'm bouta slide out ima few mins
CW-1: We're am I going
CW-1: Send addy
DONNELLY: Com down to Campbell st New Bedford imma hop in
DONNELLY: 1400
DONNELLY: $
DONNELLY: Just put in 78 so you have a reference where to b around
CW-1: Aiht cuzing I got u appreciate ya
CW-1: So I let u no wen I'm like 15 out n then wen I'm like 5 mins close that way u can
b ready

During this exchange DONNELLY confirmed the price and location of the controlled purchase.

The location being the 78 Campbell Street in New Bedford.

31.     Pursuant to the procedures outlined above, CW-1 was searched, and was provided

with an audio/video recording device and $1,400 in OAF.  At approximately 1:17 p.m.,

immediately prior to the scheduled controlled purchase, agents conducting surveillance observed

both DONNELLY and JOSEPH exit the front door of 78 Campbell Street.  CW-1 was directed

to meet with DONNELLY and purchase 20 grams of fentanyl.  CW-1 was continuously

surveilled to 78 Campbell Street in New Bedford where he/she arrived at approximately 1:43

p.m.  Agents conducting surveillance observed CW-1 arrive in front of 78 Campbell Street and

DONNELLY exited the front door of the residence and entered CW-1's vehicle.  CW-1 with

DONNELLY as front seat passenger was surveilled to a local convenience store approximately

one block away from 78 Campbell Street.  CW-1 informed agents that DONNELLY requested

CW-1 drive him to a convenience store in the vicinity of his home.  Upon their arrival, I

observed DONNELLY as he exited CW-1's vehicle and walked on County Street toward the

storefront.  CW-1 was continuously surveilled to a pre-determined meeting location.  Minutes

later, at approximately 1:47 p.m., Agents conducting surveillance observed DONNELLY walk to

and enter 78 Campbell Street.

14

32.     Upon meeting with CW-1, agents recovered the recording device, and one clear

plastic bag which contained a hard, white powdery substance consistent in color and texture of

fentanyl and weighed approximately 20.4 grams.  This substance was subjected to a field test and

the test identified the presence of fentanyl.

33.     CW-1 was debriefed and provided the following information regarding the

controlled purchase.  When CW-1 arrived at 78 Campbell Street, he/she saw DONNELLY exit

the house and walk towards the vehicle.  When DONNELLY got in the vehicle, they greeted and

shook hands.  DONNELLY told the CW-1 to go down to the end of the street and take a right.

DONNELLY provided the CW-1 with the drugs from his left coat pocket and in return the CHS

provided the money.  DONNELLY did not count the money.  When they arrived at the

convenience store, DONNELLY got out and said he did not need a ride back to his house.

34.     Furthermore, during the debrief interview CW-1 provided me with the text

messages he/she shared with DONNELLY immediately before meeting. They exchanged the

following conversation:

> DONNELLY: Gon hav u take me to store less then min away from here promis
> CW-1: I Gotchu
> DONNELLY: Lmk when 2 out
> CW-1: Like 2 min away cuz I'm in my red whip
> DONNELLY: Aight I'll b on my purch inna sec
> DONNELLY: We just finna pull off
> CW-1: Facts bout pull up I think
> DONNELLY: Ion see u yet

35.     After the controlled purchase CW-1 and DONNELLY exchanged one final text

message exchange:

> CW-1: Good looks broski b safe out here
> DONNELLY: You too shits finna get better over here when I take over and my dude
> does his time.

15

As noted above, JOSEPH is presently pending sentencing in a federal drug trafficking case.

## CONCLUSION

36.     Based upon the foregoing, I submit that there is probable cause to believe that

NIPUKTUK JOSEPH and AIDAN DONNELLY have violated federal law by conspiring to

distribute and distributing fentanyl in the District of Massachusetts in violation of 21 U.S.C. §§

846 and 841(a)(1).


      Signed electronically and sworn to telephonically in accordance with Federal Rule of

Criminal Procedure 4.1 on March ___, 2022.
                             23


                                   /s/ Evan Kalaher
                                   _____
                                   Evan Kalaher
                                   Special Agent, FBI


Electronically subscribed and telephonically sworn to before me this _____ day of March,
                                                      23rd
2022.

                                   HON. M. PAGE KELLEY
                                   UNITED STATES MAGISTRATE JUDGE